United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

THELMA VERDEL MENEFEE,

          Plaintiff,

   v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

Case No. 3:15-cv-03957-LB

**ORDER GRANTING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING THE DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

ECF Nos. 14 & 18

## INTRODUCTION

The plaintiff Thelma Verdel Menefee moves for summary judgment, seeking judicial review of a final decision by the Social Security Administration denying her disability benefits for her claimed disabilities of bilateral foot impairments, obesity, and diabetes.[1] The Administrative Law Judge ("ALJ") found that Ms. Menefee had the severe impairments of diabetes mellitus, status post bilateral bunion surgery, obesity, and nicotine addiction in partial remission, but that the total severity was insufficient to qualify for Social Security Disability Insurance ("SSDI") benefits.[2]

---

[1] Motion for Summary Judgment ("MSJ") – ECF No. 14 at 9. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] Administrative Record ("AR") 29.

1    The Commissioner opposes Ms. Menefee's motion for summary judgment and cross-moves for

2    summary judgment.[3]

3        Pursuant to Civil Local Rule 16-5, the matter is submitted for decision by this court without

4    oral argument. All parties have consented to this court's jurisdiction.[4] The court holds that the ALJ

5    erred by according little weight to the opinions of Ms. Menefee's treating physicians and by

6    finding Ms. Menefee's testimony only partly credible. The court thus grants Ms. Menefee's

7    motion, denies the Commissioner's motion, and remands the case to the ALJ to reconsider Ms.

8    Menefee's disability application in light of this order.

9

10                                    **STATEMENT**

11   **1.   Procedural History**

12       Ms. Menefee filed her initial Title II disability claim on December 6, 2011, alleging disability

13   beginning on April 30, 2010.[5] Ms. Menefee also filed a Title XVI application for supplemental

14   security income ("SSI") on December 14, 2011, alleging disability beginning on April 30, 2010.[6]

15   The Social Security Administration ("SSA") found that Ms. Menefee's disability was not severe

16   enough to keep her from working, denied her claim on May 4, 2012, and denied her claim on

17   reconsideration on February 20, 2013.[7]

18       Ms. Menefee timely filed her request for a hearing on February 28, 2013,[8] appealing the SSA's

19   decision and requesting a hearing before the ALJ.[9] The hearing was on November 14, 2013, in

20   Oakland, California.[10] Ms. Menefee attended the hearing unrepresented, but the ALJ continued the

21

22

23   [3] Cross-Motion for Summary Judgment ("Cross-MSJ") – ECF No. 18.

     [4] Consent Forms – ECF Nos. 5 & 9.

24   [5] AR 26.

25   [6] *Id.*

26   [7] *Id.*

     [8] *Id.*

27   [9] *Id.*

28   [10] AR 29.

United States District Court
Northern District of California

hearing for Ms. Menefee to find representation.[11] Ms. Menefee secured Barbara Mann as her counsel, and Ms. Mann requested a postponement of the January 30 hearing, which the ALJ denied.[12] The ALJ presided over the hearing on January 30, 2014, in Oakland, California; Ms. Menefee, Ms. Mann, and impartial vocational expert ("VE") Stephen P. Davis also attended the hearing.[13] The ALJ addressed the issue of whether Ms. Menefee met the SSA's definition of "disabled" under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.[14] The ALJ also addressed whether Ms. Menefee was disabled within the applicable disability period of April 30, 2010, to March 31, 2014.[15] The ALJ found that Ms. Menefee was not disabled.[16]

Ms. Menefee requested review of the ALJ's decision by the Appeals Council on March 6, 2014.[17] The Appeals Council denied the request for review on June 29, 2015, finding insufficient evidence of abuse of discretion, error of law, or a major public policy concern.[18] The Appeals Council also did not find that there was insufficient evidence to support the ALJ's claim or that newly submitted evidence outweighed the evidence already submitted.[19] The Appeals Council noted that the new evidence Ms. Menefee submitted was not applicable to their decision because it applied to dates after the ALJ rendered a decision.[20]

Ms. Menefee sued in federal court on August 28, 2015.[21] The SSA answered the complaint on December 17, 2015, and Ms. Menefee moved for summary judgment on January 19, 2016.[22] After

---

[11] AR 26.

[12] *Id.*

[13] *Id.*; AR 37.

[14] AR 26.

[15] *Id.*

[16] AR 37.

[17] AR 1.

[18] *Id.*

[19] AR 1-2.

[20] AR 2.

[21] Compl. – ECF No. 1.

[22] Answer – ECF No. 12; MSJ – ECF No. 14.

United States District Court
Northern District of California

1  filing a stipulation to extend time, the Commissioner filed a response and cross-motion for

2  summary judgment on March 31, 2016.[23] Ms. Menefee did not file a reply.[24]

3

4  **2.   Summary of Record and Administrative Findings**

5     **2.1  Medical Records**

6        **2.1.1  Dr. Wengang Zhang: Primary Care Physician**

7     Ms. Menefee first met with Dr. Zhang, an internist, on January 26, 2010, at his office at

8  Springhill Medical Group in Pittsburg, California.[25] Dr. Zhang acted as Ms. Menefee's Primary

9  Care Physician during most of the applicable time period, from before the disability onset date of

10 April 30, 2010, until January 28, 2014.[26]

11    Ms. Menefee saw Dr. Zhang on April 26, 2010, shortly before the beginning of her disability

12 onset period.[27] At this visit, Dr. Zhang conducted a follow-up examination, and noted that Ms.

13 Menefee's current medications were Vicodin and Glucophage.[28] Dr. Zhang noted Ms. Menefee's

14 leg weakness and pain, and also that her diabetes was under control.[29] He also noted Ms.

15 Menefee's other conditions, including a thyroid goiter, athlete's foot, vitamin D deficiency,

16 obesity, status post hysterectomy, and muscle weakness.[30] Dr. Zhang recommended a low

17 cholesterol and low calorie diet, counseled Ms. Menefee regarding her anti-hypertensive

18 medications, and requested that she return in one to two months.[31]

19

20

21

22  [23] Stipulation Extending Briefing Schedule – ECF No. 16; Cross-MSJ – ECF No. 18.

23  [24] *See generally* Docket.

24  [25] AR 918.

     [26] AR 77.

25  [27] AR 635.

26  [28] *Id.*

     [29] *Id.*

27  [30] *Id.*

28  [31] AR 636.

A visit to Dr. Zhang on November 3, 2010, resulted in a physical and a note that Ms. Menefee was "doing fine."[32] Ms. Menefee returned to Dr. Zhang on March 14, 2011, complaining of abdominal pain on her left side, which had lasted for three weeks.[33] Noting Ms. Menefee's past history of diverticulitis and polyp removals, Dr. Zhang suggested that the pain may be caused by a flare-up of diverticulitis.[34] Three days later, Dr. Zhang reported that the symptoms had not improved.[35]

Ms. Menefee went to the emergency room at Sutter Delta Medical Center on February 10, 2012, complaining of acute abdominal pain, vomiting, and cramping.[36] Ms. Menefee's CT scan showed only fatty liver and a small hernia.[37] She was stabilized and released when the doctor found that Ms. Menefee did not have a condition that warranted any further intervention or testing.[38]

Ms. Menefee returned to see Dr. Zhang on a number of occasions throughout 2012 and 2013. On February 24, 2012, Dr. Zhang stated that Ms. Menefee was "doing fine."[39] On February 26, 2012, Dr. Zhang completed a disability questionnaire for Ms. Menefee, and found her diabetes to be under satisfactory control.[40]

Dr. Zhang conducted a follow-up disability questionnaire on March 9, 2012, and noted Ms. Menefee's pain level of five or six out of ten and fatigue level of six out of ten.[41] He also noted that her doctors had not been able to relieve the pain without causing unduly harsh side effects.[42]

---

[32] AR 626.

[33] AR 358.

[34] AR 358-59.

[35] AR 356.

[36] AR 415.

[37] AR 417.

[38] *Id.*

[39] AR 613.

[40] AR 457.

[41] AR 504-05.

[42] *Id.*

United States District Court
Northern District of California

His analysis showed that in an eight-hour day, Ms. Menefee could walk for up to three hours, and sit for up to three hours.[43] Dr. Zhang noted that Ms. Menefee did not use a cane.[44] Dr. Zhang noted that Ms. Menefee could occasionally lift up to ten pounds, and rarely lift up to twenty pounds.[45] He noted that she has significant limitations in repetitive reaching, handling, fingering, and lifting.[46] He also noted that Ms. Menefee suffered from unnamed "psychological limitations," and found that her impairments are expected to continue into the future.[47]

On February 16, 2012, Ms. Menefee visited a cardiologist, Dr. Alejandro Prieto, who noted that Ms. Menefee did not suffer from shortness of breath or other typical symptoms related to cardiovascular disease.[48] On March 19, 2012, Ms. Menefee visited Dr. Daniel Patrick, another cardiologist, who performed a SPECT scan, and found no significant abnormalities.[49] Ms. Menefee returned to see Dr. Prieto on July 26, 2012, who noted that Ms. Menefee still had pain and trouble sleeping, but that she had no other significant abnormalities.[50]

Ms. Menefee visited Dr. Zhang on August 22, 2012, and she was again described as "doing ok."[51] She returned two days later and complained of ankle and leg pain.[52] She said that wedge shoes helped her pain and she tried exercising at the gym, but exercise made her pain worse.[53] On October 22, 2012, Dr. Zhang noted that Ms. Menefee should take Vicodin before exercise, and that she was struggling to lose weight.[54] On November 26, 2012, Dr. Zhang examined her past

---

[43] *Id.*

[44] AR 505.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] AR 615.

[49] AR 510.

[50] AR 605-06.

[51] AR 602.

[52] AR 137.

[53] *Id.*

[54] AR 599.

complaint of claudication and referred the issue out to Ms. Menefee's podiatrist.[55] There is no record of Ms. Menefee following up with her podiatrist regarding the alleged claudication.

On February 18, 2013, Dr. Zhang noted that Ms. Menefee was doing fine, but complained about muscle aches, left lower quadrant abdominal pain, and poor bowel movements.[56] On May 20, 2013, Dr. Zhang noted that Ms. Menefee was on a diet plan, and observed improvements in pain levels and tolerance of exercise.[57] On August 19, 2013, Dr. Zhang noted that Ms. Menefee had a cough and diagnosed her with bronchitis, and prescribed Azithromycin to treat it.[58] On the February 18, May 20, and August 19 visits, as well as a final visit on February 3, 2014, Dr. Zhang noted that Ms. Menefee suffered no complications from diabetes and no general abnormalities.[59]

### 2.1.2  Dr. James Boccio: Surgical Podiatrist

Ms. Menefee saw Dr. Boccio, a podiatric surgeon, for a preoperative examination on May 4, 2010.[60] He noted that Ms. Menefee took Glucophage, Premarin, vitamins, and Xenotril.[61] Ms. Menefee returned to Dr. Boccio the following day for surgery: she received a left-foot bunionectomy and osteotomy first metatarsal on May 5, 2010.[62] Dr. Boccio noted no complications from the procedures.[63] Ms. Menefee returned on May 7 for a follow-up; Dr. Boccio noted no complications and that she was "doing ok."[64] On May 17, 2010, Dr. Boccio noted that Ms. Menefee's bandages had fallen off and he replaced them.[65] At a follow-up appointment on

---

[55] AR 753.

[56] AR 749.

[57] AR 746.

[58] AR 814.

[59] AR 746, 749, 808, 814.

[60] AR 409.

[61] AR 407.

[62] AR 483.

[63] *Id.*

[64] AR 400-01.

[65] AR 399.

August 26, 2010, Ms. Menefee stated that her big toe was feeling better.[66] At the hearing in front of the ALJ on January 30, 2014, however, Ms. Menefee rated her pain on the bottom of her feet at an eight out of ten.[67]

Ms. Menefee returned to Dr. Boccio on November 28, 2011, for a consultation,[68] and December 5, 2011, for a pre-operative examination, where Dr. Boccio determined that he would perform a right-foot bunionectomy.[69] Dr. Boccio completed the right-foot procedure on December 7, 2011.[70] Dr. Boccio noted at a January 26, 2012 follow-up appointment to the second procedure that her foot was healing well, although soft tissue swelling persisted.[71] On February 21, 2012, Christopher Munoz, Ms. Menefee's physical therapist, wrote that she completed physical therapy, her range of motion was regular, and she experienced swelling with extended walking.[72] On March 8, 2012, Dr. Boccio listed Ms. Menefee's prognosis pertaining to her continuing impairments as "fair."[73] Another follow-up on May 25, 2012, resulted in a dermatologic consultation regarding psoriasis and a description of her diabetes as "ok."[74]

At Ms. Menefee's March 8 visit, Dr. Boccio completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment.[75] In this examination, Dr. Boccio found the following: (1) Ms. Menefee was diagnosed with bilateral hallux valgus and painful bunions; (2) Dr. Boccio estimated her pain level at between nine and ten out of ten; (3) Ms. Menefee's pain has not been eliminated with medications; (4) in an eight-hour day she can sit for up to four hours and stand or walk up to two hours; (5) she can occasionally carry up to ten

---

[66] AR 395.

[67] AR 84.

[68] AR 393.

[69] AR 392.

[70] AR 384.

[71] AR 394.

[72] AR 580.

[73] AR 492.

[74] AR 607.

[75] AR 492-95.

United States District Court
Northern District of California

pounds and rarely carry up to twenty pounds; (6) she has significant limitations in repetitive reaching, handling, fingering, and lifting; (7) she can stand or walk only with a cane; (8) and her symptoms can be expected to continue.[76] His prognosis regarding Ms. Menefee's ability to work in a competitive job was poor.[77] He also noted that she has limitations in stooping, kneeling, pushing, pulling, bending, and climbing ladders or stairs.[78] Dr. Boccio noted that emotional factors do not contribute to the severity of her symptoms.[79] He also noted that she would be able to tolerate up to moderate stress in the workplace, but that she would likely miss two to three days per month from work due to her symptoms.[80] Immediately following the question regarding work stress, the survey asks "please explain the basis for your conclusion."[81] Dr. Boccio wrote on this line that he based his conclusion on his in-office conversation with Ms. Menefee.[82]

### 2.1.3  Dr. Calvin Pon: State Examining Physician

Ms. Menefee saw Dr. Pon on July 25, 2013, at the request of the Social Security Administration.[83] At this visit, Dr. Pon noted that Ms. Menefee regularly used a cane for the past two to three years and that the cane does not provide symptomatic relief, but does support her in walking in her apartment and outside.[84] He commented on Ms. Menefee's past medical history and surgeries, and performed a physical examination.[85]

During the examination, Dr. Pon noted the following of Ms. Menefee's condition: (1) she requires the use of the arm of a chair and her cane to stand up from a sitting position; (2) she can

---

[76] AR 492-93.

[77] AR 493.

[78] AR 494.

[79] *Id.*

[80] AR 495.

[81] *Id.*

[82] *Id.*

[83] AR 781.

[84] *Id.*

[85] AR 782.

stand without the support of her cane; (3) her gait velocity and stride length are slightly less than normal but she does not limp; (4) she refuses to walk without her cane; (5) and she was unable to get onto the exam table, even with the assistance of her cane.[86] He found that her neck and spine were normal, but she complained of pain in her left flank; examinations of her upper extremities were normal.[87] He noted postsurgical scars on both great toes as a result of the bunionectomies; she complained of tenderness and pain at the plantar aspect on both feet.[88] He noted a thirty-degree ankle-movement restriction in both ankles.[89] He assessed her condition as chronic residual bilateral foot pain and occasional associated numbness, and possible superimposed peripheral neuropathy from her diabetes.[90]

Dr. Pon also examined Ms. Menefee's functional capacity at this visit.[91] He noted the following: (1) no visual impairment; (2) no problems understanding speech or conversation; (3) no speech impediment; (4) with use of a cane she could walk up to four hours in an eight-hour workday; (5) she could sit for a total of six hours in an eight-hour workday; (6) her ability to stoop was impeded by pain; (7) she can crouch, kneel, and squat occasionally; (8) she should limit her climbing of stairs or ladders; (9) and she has no restrictions with crawling, bilateral pushing or pulling, or arm-hand control.[92] He also noted that Ms. Menefee's ability to lift and carry would be limited by usage of a cane, but that she can still lift up to ten pounds, bilaterally reach, and perform gross and fine manipulation.[93]

---

[86] *Id.*

[87] *Id.*

[88] AR 783.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

### 2.1.4  Dr. Kyle Van Gaasbeek: Psychiatric Evaluator

Ms. Menefee first saw Dr. Van Gaasbeek on January 26, 2013.[94] Her chief complaints were anxiety, body aches, foot pain, and vision loss.[95] She also reported leg pain, diabetes, and a hernia.[96] Ms. Menefee reported impatience and increased anxiety symptoms, but stated that she has not sought anxiety treatment because she "doesn't have time for it."[97] She also notified Dr. Van Gaasbeek of her lack of past psychiatric treatment.[98] She told him that she lost her home about a year before, she is now staying with friends in their homes, and her last job was in 2009 in customer support.[99] Her days consist of stretching, going to different destinations, and taking care of herself, and she reported that she sometimes watches television.[100]

Dr. Van Gaasbeek noted that Ms. Menefee's concentration, persistence, and pace was difficult, that she was "odd," and that she understood that she has problems communicating with other people.[101] He also noted that her thoughts tend to be circumstantial, causing his gathering of her history of stream of mental activity to be difficult.[102] He noted her mood was depressed and irritable, but that her depression was treatable and it was difficult to determine how much of her depression was caused by her physical symptoms as opposed to potential other personality issues.[103]

His functional assessment/medical source statement included the following: (1) she is capable of managing her own funds; (2) her ability to perform simple and repetitive tasks is unimpaired; (3) her ability to perform complex tasks is moderately impaired; (4) she is able to accept

---

[94] AR 740.

[95] Id.

[96] AR 741.

[97] Id.

[98] AR 740-41.

[99] AR 741.

[100] Id.

[101] Id.

[102] Id.

[103] AR 741-42.

instructions from supervisors; (5) her ability to interact with coworkers and the public is mildly impaired; (6) her ability to perform work activities without special attention is unimpaired; (7) her ability to regularly attend work for psychiatric reasons is unimpaired; (8) her ability to complete a normal workday without interruptions due to psychiatric conditions is mildly impaired; (9) her ability to deal with usual workplace stress is unimpaired; (10) her intellectual function is in the low-average range; (11) she was alert and oriented; (12) her immediate memory is excellent, but her recent memory is poor and her past memory is limited; (13) her fund of knowledge is fair; (14) her abstract thinking is limited; and (15) her judgment and insight were adequate.[104] He diagnosed Ms. Menefee with unspecified depression and assigned her a GAF score of 55.[105]

### 2.1.5  Dr. Akindele Kolade: Treating Psychiatrist

Ms. Menefee first saw Dr. Kolade on January 21, 2014, complaining of anxiety in social settings with worsening progression.[106] Ms. Menefee described the severity of her anxiety as eight out of ten and described the following symptoms: anxiety, increased worry, irritable, palpitations, shortness of breath, and sweating.[107] Dr. Kolade noted a previous diagnosis of generalized anxiety disorder without a date attached.[108] He noted a family history of mental health problems: her sister has anxiety, her maternal grandmother had mental illness, and her mother had panic attacks.[109] He noted that Ms. Menefee did not exhibit signs of depression, anxiety, eating disorder, psychosis, panic attacks, or suicidal attempts.[110] He diagnosed Ms. Menefee with generalized anxiety disorder, unspecified dementia without behavioral disturbance, and panic disorder.[111] He

---

[104] AR 742-43.

[105] AR 743.

[106] AR 804.

[107] *Id.*

[108] *Id.*

[109] AR 805.

[110] AR 804.

[111] AR 807.

United States District Court
Northern District of California

prescribed the continued use of clonazepam and Cymbalta.[112] At a subsequent visit on March 17, 2014, he added Seroquil to her prescriptions.[113]

### 2.1.6  Dr. L. Colsky: State Examiner

On behalf of the state, Dr. Colsky examined Ms. Menefee on February 15, 2013.[114] In determining Ms. Menefee's credibility, Dr. Colsky took into account Ms. Menefee's activities of daily living, the qualities of her pain, medication treatments, and other treatments, and he stated that she did not suffer from any severe impairment for at least a twelve-month period.[115] Dr. Colsky found that Ms. Menefee's impairments were supported by the available evidence, but their duration and severity were not fully credible.[116]

Dr. Colsky also examined Ms. Menefee's Residual Functional Capacity ("RFC") on this date.[117] Dr. Colsky found that Ms. Menefee had no significant limitations in her ability to: (1) remember locations and work procedures; (2) understand and remember short or detailed instructions; (3) carry out short or detailed instructions; (4)  maintain attention and concentration; (5) follow a schedule and be punctual; (6) sustain a regular routine; (7) make simple work-related decisions; (8) perform a normal weekday at a consistent pace; (9) ask simple questions, accept instructions and respond appropriately to them; (11) and maintain socially appropriate behavior.[118] Dr. Colsky also found that Ms. Menefee had moderate limitations in her ability to work in coordination with others without being distracted, her ability to interact with the general public, and her ability to get along with coworkers or peers.[119] Dr. Colsky noted additional limitations in

---

[112] AR 804-05.

[113] AR 848.

[114] AR 138-44.

[115] AR 139.

[116] *Id.*

[117] AR 140-41.

[118] *Id.*

[119] *Id.*

the areas of comprehension and memory, sustained concentration and persistence, social interactions, and interacting appropriately with others on a sustained basis.[120]

### 2.2  Ms. Menefee's Testimony

Ms. Menefee testified before the ALJ on January 30, 2014.[121] The ALJ first asked Ms. Menefee about whether she still lived with relatives or friends; Ms. Menefee stated that she did.[122]

The ALJ asked Ms. Menefee why she felt she was unable to work; Ms. Menefee responded that she has pain throughout her body, limited motion, and mental changes including depression and suicide.[123] Ms. Menefee then testified as to her then-current mental health treatment with Dr. Kolade, which began about four months before the hearing date.[124] She testified that Dr. Kolade prescribed her clonazepam and duloxetine, which she had been taking for about a week but had not noticed any difference.[125] Ms. Menefee also testified that she was not seeing a psychologist, therapist, or social worker.[126]

The ALJ then asked Ms. Menefee about her physical pain, which she described as being present in her upper legs, arms, and the bottoms of her feet when walking, and she attributed the pain to her diabetes.[127] She stated that the pain had been present for between four and five years.[128] Ms. Menefee also stated that she told her doctors about her pain, and her doctors told her that she needed to exercise more often but the pain gets worse with exercises other than walking.[129] Ms. Menefee also disclosed using a cane for the two years previous to the hearing because of right-side

---

[120] *Id.*

[121] AR 68.

[122] AR 71.

[123] *Id.*

[124] *Id.*

[125] AR 72.

[126] AR 73.

[127] *Id.*

[128] *Id.*

[129] AR 74.

United States District Court
Northern District of California

weakness and balance issues, stated that the cane was not prescribed by her doctor, admitted that she bought the cane herself, and professed that when she told her doctors about her cane use, they did not say anything.[130]

Ms. Menefee stated that she was still taking metformin to treat her diabetes, that the metformin keeps her diabetes under control "sometimes," and that she does not use insulin.[131] She also stated that she takes oxycodone in the morning and evening "as it's prescribed," and that "[i]t makes [her] "very tired."[132] She did not take oxycodone the morning before the hearing.[133] She also testified that without the oxycodone, "[her] pain becomes unbearable."[134]

Ms. Menefee testified that she saw Dr. Zhang about once every three months, but that she had a new doctor: Dr. Edwards.[135] She stated that she switched to Dr. Edwards for her internal pain because although she had been seeing Dr. Zhang for a long time, she believed he was not providing solutions to her pain.[136] Dr. Edwards was the doctor who prescribed the oxycodone.[137] Ms. Menefee also stated that she had quit smoking cigarettes in December 2013 after over twenty years, with the help of Chantix, a medication.[138] She also denied drinking alcohol, using drugs not prescribed for her, or using medical marijuana.[139]

Ms. Menefee stated that in addition to her pain in her arms, legs, and the bottoms of her feet, and her depression, her mental state also prevented her from working.[140] She stated that in the past three to four months, she "constantly [had] fears[,] . . . thoughts of suicide, and [thought] that

---

[130] AR 74-75.

[131] AR 75.

[132] AR 75-76.

[133] AR 76.

[134] *Id.*

[135] AR 76-77.

[136] AR 77

[137] AR 77-78.

[138] AR 78.

[139] AR 78-79.

[140] AR 79.

people were after [her]."[141] She testified that these feelings were triggered because she was "raped and beat up."[142] She also said that the people she was staying with at the time told her that if she said anything about the rape, she wouldn't be able to stay there anymore.[143]

The ALJ then asked Ms. Menefee what she does during the day.[144] Ms. Menefee stated that during the day, she gets and reads magazines, walks "from one place to another maybe just for twenty minutes," and then sits at a bench "[if] there's a nearby park" for an hour or two until the people she was staying with got home because she was not allowed to be in the house alone.[145] She also testified that she has problems sleeping, sleeps about four hours per night, and does not nap during the day.[146] She stated that she does not have problems with any simple self-care tasks and that she does not do any chores.[147] She also stated that she was able to walk for about twenty minutes without pausing but that her pain increases while walking.[148] At the time of the hearing, she rated her pain level in her thighs and lower legs at seven out of ten, and that the pain was throbbing.[149] She also mentioned never having found a doctor to treat her potential diagnosis of claudication and stated that she did not understand some of the things Dr. Zhang said.[150]

Ms. Menefee also stated that she began seeing Dr. Edwards based on a referral from a relative and Dr. Kolade because her "thought patterns [were] not normal for the type of person [she is]."[151] She described herself as normally uplifting and positive and that she was taught to always be the

---

[141] *Id.*

[142] *Id.*

[143] AR 80.

[144] *Id.*

[145] *Id.*

[146] *Id.*

[147] AR 81.

[148] *Id.*

[149] AR 81-82.

[150] AR 82.

[151] *Id.*

United States District Court
Northern District of California

best person she could be; her thought patterns completely changed that outlook on life.[152] She said she no longer had the drive she used to have.[153]

She testified that was laid off from her last job in March 2009 because the department she worked in moved and her position was eliminated.[154] She then said that she stopped working because of a large fibroid tumor "that was about to burst" in 2009 or 2010.[155] She testified that the first bunionectomy stopped her toe pain, but she still had pain on the bottom of her foot that, on the date of her hearing, was at a level of eight out of ten all the time.[156] She testified to treating the pain with Epsom salt baths, therapy, and staying off her feet.[157] She testified that the second bunionectomy was "at the same time" as the first, or about a month apart, and that the pain on the bottom of her right foot was as severe as the pain on her left foot.[158]

### 2.3  Vocational Expert Testimony

Vocational Expert Stephan P. Davis testified at the hearing on January 30, 2014.[159] Mr. Davis, having reviewed Ms. Menefee's work history, asked Ms. Menefee about the scope of her position as a customer service supervisor, and ascertained that she also gave advice regarding the software programs SQL, Linux, and Knowledge Base, in addition to supervising other employees.[160] When Mr. Davis asked Ms. Menefee where she was trained, she stated that she received on-the-job training and also attended Heald Business College, which was inapplicable to the work she was

---

[152] *Id.*

[153] *Id.*

[154] AR 83.

[155] *Id.*; *see also* AR 1092 (indicating that the hysterectomy, which removed the fibroid, occurred on April 8, 2010).

[156] AR 84.

[157] *Id.*

[158] AR 85.

[159] AR 86.

[160] AR 87.

1    doing.[161] Ms. Menefee stated that the maximum weight she lifted at her previous job was five

2    pounds.[162]

3        Mr. Davis described two of Ms. Menefee's previous jobs as sedentary: accounting clerk and

4    user support analyst.[163] Mr. Davis also described as "light" Ms. Menefee's previous job as a retail

5    salesperson.[164] The ALJ had Mr. Davis assume a person of Ms. Menefee's age, education, and

6    work history, limited to light work and lifting up to twenty pounds occasionally and ten pounds

7    frequently, and using a cane that limits lifting and carrying up to ten pounds occasionally and

8    frequently.[165] The ALJ further had Mr. Davis assume that that person can stand and walk up to

9    four hours with a cane, sit for up to six hours, occasionally crouch, kneel, squat, stoop, climb

10   stairs, frequently use bilateral lower extremity for foot controls, and no limits on reaching,

11   grasping, gripping, handling, and fingering.[166]

12       The ALJ stated "this individual can perform simple, complex work, but no work involving

13   public contact, occasional interaction with co-workers and supervisors, [and] no work on a

14   team."[167] The ALJ asked Mr. Davis if such a person could perform any past work; he answered

15   no.[168] Mr. Davis testified that such a person could perform other work, including approximately

16   40% of unskilled jobs, such as an "investigator, dealer accounts," shipping and receiving weigher,

17   night auditor, or mail clerk.[169]

18       Ms. Menefee's attorney then asked whether a person who had all the above limitations but also

19   would be off-task five percent, or twenty-four minutes, of the workday would limit any of the

20

21

_____

22   [161] AR 88.

23   [162] Id.

24   [163] AR 88-89.

     [164] AR 89.

25   [165] Id.

26   [166] Id.

27   [167] Id.

     [168] Id.

28   [169] AR 90-91.

1    jobs.[170] Mr. Davis responded no, but the totality of the conditions might eliminate five percent of

2    the jobs.[171] Being off-task for ten percent of the time would eliminate more positions.[172] With the

3    added condition of missing two to three days of work per month, Mr. Davis stated that "it would

4    rule out all work."[173]

5

6        **2.4  Administrative Findings**

7        The ALJ evaluated Ms. Menefee's disability application with the five-step analysis found in

8    20 C.F.R. § 404.1520(a)(4). Those questions ask the following to determine whether a claimant is

9    disabled: (1) whether the claimant is presently engaging in substantial gainful activity; (2) whether

10   the claimant's impairment(s) is severe; (3) whether the claimant's impairment (or combination of

11   impairments) meets or equals a listing in the applicable regulation; (4) whether the claimant is able

12   to perform any past work; and (5) whether the claimant is able to make an adjustment to other

13   types of work, taking into consideration his or her age, education, and work experience. *See* 20

14   C.F.R. § 404.1520(a)(4). After analyzing all five steps, the ALJ held that Ms. Menefee was not

15   disabled within the meaning of the Social Security Act from April 30, 2010, through March 31,

16   2014 (the date last insured).[174]

17       At step one, the ALJ found that that Ms. Menefee did not engage in substantial gainful activity

18   from April 30, 2010, through March 31, 2014.[175]

19       At step two, the ALJ found that Ms. Menefee had the following severe impairments: "diabetes

20   mellitus; status post bilateral bunion surgery; obesity; and nicotine addiction in partial

21   remission."[176] The ALJ found that these impairments "more than minimally affect the claimant's

22

23   ─────────────────────────

24   [170] AR 92.

     [171] *Id.*

25   [172] *Id.*

26   [173] AR 92-93.

     [174] AR 27.

27   [175] AR 28.

28   [176] AR 29.

ability to perform basic work activities . . . and are therefore 'severe.'"[177] The ALJ also found that Ms. Menefee's impairment of depression does not cause more than minimal limitation to perform basic work activities, and therefore it was not a severe impairment.[178]

In determining whether mental impairments are "severe," the ALJ considered four "broad functional areas" to evaluate mental disorders: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation of extended duration.[179]

First, regarding the functional area of daily living, the ALJ found that Ms. Menefee has no more than a mild limitation.[180] The ALJ distinguished between limitations in activities of daily living due to physical conditions and those due to mental conditions; she stated that the mental conditions do not cause any more than mild limitations.[181] The ALJ noted that Ms. Menefee prepares her own meals, does chores, goes out multiple times per week, goes grocery shopping, and watches television.[182] The ALJ noted Ms. Menefee's testimony at the hearing regarding her daily activities of reading magazines and sitting and walking at a park until the people she stays with come home.[183] The ALJ recalled Dr. Van Gaasbeek's notes of Ms. Menefee's description of her daily activities: stretching, going to different destinations including park benches where she reads magazines, taking care of herself, and watching television.[184] The ALJ also noted that the State agency psychological consultant found that Ms. Menefee had no restriction in this area at all, and so found that she had "no more than" a mild restriction in this area.[185]

---

[177] *Id.*

[178] *Id.*

[179] *Id.* at 29-30; *see also* 20 C.F.R. Part 404, Subpart P, Appx. 1, ¶ 12, accessed at https://www.ssa.gov/OP_Home/cfr20/404/404-app-p01.htm.

[180] AR 29.

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] *Id.*

Second, in the functional area of social functioning, the ALJ found that Ms. Menefee has a mild limitation.[186] The ALJ based this finding on Ms. Menefee's social activities, which include spending time with family members, going to church, and going to doctor's appointments.[187] The ALJ acknowledged Ms. Menefee's short attention span and problems communicating, but discounted the State agency psychological consultant's finding of a moderate limitation maintaining social functioning and instead found she had a mild limitation.[188]

Third, in the next functional area of concentration, persistence, or pace, the ALJ found that Ms. Menefee has a mild limitation.[189] The ALJ considered Ms. Menefee's Function Report, in which Ms. Menefee reported that "she can pay attention for 30 minutes; does not finish what she starts; has to read written instruction 4 times to make sure she understands; and follow[s] spoken instructions very well if spoken slowly and clearly."[190] The ALJ took into account Ms. Menefee's psychological evaluation, in which she could immediately recall three out of three objects but was unable to recall any of them after several minutes, was able to perform a simple calculation, made a mistake spelling the word "world" backwards after correctly spelling it forwards, and successfully repeated a string of numbers.[191] The ALJ considered Dr. Van Gaasbeek's finding at the psychological evaluation that Ms. Menefee has no limitation in simple and repetitive tasks and mild limitation in detailed and complex tasks.[192] The ALJ agreed with Dr. Van Gaasbeek's finding that Ms. Menefee had mild limitation in concentration, persistence, or pace.[193]

Fourth, in the functional area of episodes of decompensation, the ALJ found that Ms. Menefee has not experienced any episodes of decompensation of extended duration.[194]

---

[186] Id.

[187] Id.

[188] Id.

[189] Id.

[190] Id.

[191] AR 30.

[192] Id.

[193] Id.

[194] Id.

United States District Court
Northern District of California

Because none of the functional areas were found to impose any more than a mild limitation, Ms. Menefee's mental impairments were found to be "nonsevere."[195] Before considering the third step in the disability analysis, the ALJ also addressed Ms. Menefee's other alleged mental impairments.[196] The ALJ found that although Ms. Menefee complained of anxiety as early as January 2013, she did not seek treatment for it until January 2014, when she first went to see Dr. Kolade.[197] The ALJ noted that Dr. Kolade diagnosed Ms. Menefee with generalized anxiety order and panic disorder, but noted that the durational requirement of twelve months was not fulfilled.[198] The ALJ also addressed Ms. Menefee's claim of neuropathy, which she dismissed as being unsupported by the treatment records and objective findings.[199]

At step three, the ALJ found that Ms. Menefee did not have an impairment or combination of impairments that meets or medically equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.[200] After considering the evidence, the ALJ stated that the evidence failed to support a finding that Ms. Menefee's impairments are supported by clinical findings that meet the necessary criteria of a listed impairment.[201]

To examine the fourth step, the ALJ followed a two-step process in which she determined whether there were underlying medically determinable physical or mental impairments that could reasonably be expected to produce Ms. Menefee's pain or symptoms, and the extent to which the impairments limited Ms. Menefee's functioning.[202] The ALJ considered all symptoms and the extent to which they can be accepted as consistent with the medical evidence and other evidence including opinions.[203]

---

[195] Id.

[196] Id.

[197] Id.

[198] Id.

[199] Id.

[200] Id.

[201] AR 31.

[202] Id.

[203] Id.

The ALJ found that Ms. Menefee's Residual Functional Capacity ("RFC") allowed her to perform less than the full range of "light work."[204] Specifically, the ALJ found that Ms. Menefee: (1) can lift twenty pounds occasionally and ten pounds frequently, including if she needs a cane; (2) can stand and walk for four hours in an eight-hour workday; (3) can sit for six hours in an eight-hour workday; (4) can occasionally crouch, kneel, squat, stoop, and climb stairs; (5) has no limitations on crawling, reaching, grasping, gripping, handling, or fingering; (6) can use her legs for foot controls; (7) can perform simple and complex work; (8) can have occasional interaction with coworkers and supervisors; and (9) cannot work with the public or on a team.[205]

The ALJ then described the findings regarding Ms. Menefee's testimony at the hearing on January 31, 2014.[206] Taking Ms. Menefee's testimony into consideration, the ALJ found that Ms. Menefee's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but also found that Ms. Menefee's statements were not entirely credible.[207]

The ALJ provided a number of reasons that she did not consider credible Ms. Menefee's statements regarding the intensity, persistence, and limiting effects of her symptoms.[208] Regarding Ms. Menefee's foot pain, the ALJ noted that following the left bunionectomy, Ms. Menefee made excellent progress on her big toe and had no problems with her left foot after the surgery.[209] Similarly, after the right bunionectomy, Ms. Menefee healed well after seven weeks, although she reported increased swelling when she walked and bore weight on her foot, she was advised to begin using a cane, and she continued to experience pain in her ankle and legs.[210] The ALJ also noted Dr. Boccio's suggestions to wear wedge shoes, use orthotics, and work out at the gym.[211] The ALJ also noted that Ms. Menefee reported improvements on her left arm, but also leg

---

[204] *Id.*

[205] *Id.*

[206] AR 32-33.

[207] AR 33.

[208] *Id.*

[209] *Id.*

[210] *Id.*

[211] *Id.*

1    weakness and pain; the medical records showed no edema, foot ulcers, cyanotic nail beds, digital

2    ulcers, or varicose veins.[212]

3        The ALJ also assessed Ms. Menefee's diabetes, stating that it is uncomplicated and well-

4    controlled with medications.[213] The ALJ noted Dr. Zhang's report about vision problems and a

5    questionable diagnosis of claudication, but accorded little weight to these problems considering

6    Ms. Menefee's failure to follow up.[214]

7        Next, the ALJ determined Ms. Menefee's residual functional capacity. First, the ALJ gave

8    great weight to the opinions of Dr. Pon, the state examining physician.[215] The ALJ specifically

9    pointed to Ms. Menefee's ability to stand without her cane and her lack of limp and then her

10   refusal to ambulate without her cane and inability to get onto the examination table without use of

11   her cane.[216] The ALJ noted a number of Dr. Pon's measurements of Ms. Menefee's flexibility and

12   pain levels.[217] The ALJ then repeated Dr. Pon's residual functional capacity findings.[218]

13       The ALJ assigned less weight to Dr. Boccio, who opined that Ms. Menefee was able to stand

14   and sit for two and four hours, respectively, per eight-hour day.[219] Dr. Boccio's finding was more

15   restrictive than Dr. Pon's, who found that Ms. Menefee could stand for four hours and sit for six

16   hours in each eight-hour day.[220] The ALJ stated that Dr. Boccio's opinion was not consistent with

17   his treatment notes and noted that he based his conclusions based on an office visit

18   conversation.[221]

19

20

21   [212] AR 33.

22   [213] AR 34.

23   [214] *Id.*

24   [215] *Id.*

25   [216] *Id.*

26   [217] *Id.*

     [218] *Id.*

27   [219] *Id.*

     [220] *Id.*

28   [221] *Id.*

The ALJ also assigned little weight to Dr. Zhang's opinion that Ms. Menefee could stand for three hours per day and sit for three hours per day[222] because "it appears to be based on the claimant's subjective complaints rather than the treatment records, which indicate that [Ms. Menefee] has not received any treatment for lower extremity pain."[223]

The ALJ assigned great weight to the psychological opinions of Dr. Van Gaasbeek, the state psychiatric evaluator, because he directly examined Ms. Menefee and his opinion was consistent with his findings.[224] The ALJ also noted that no mental health treatment records support any greater limitations than in the record.[225] The ALJ assigned some weight to the assessment by Dr. Colsky, but only insofar as it was consistent with the other RFC assessments.[226] The ALJ did not assign any weight to the report of Dr. Kolade, stating that Dr. Kolade performed only an initial evaluation and did not identify any functional limitations.[227]

The ALJ noted a number of inconsistencies in Ms. Menefee's testimony.[228] The ALJ stated that these inconsistencies were not likely the result of intent to mislead, but that, nevertheless, Ms. Menefee's testimony was not reliable.[229] Specifically, she cited the differences in Ms. Menefee's professed functional limitations, the different stories regarding why she left her most recent job, and the possibility that Ms. Menefee did not leave her job for medical reasons.[230] The ALJ also noted that Ms. Menefee testified she had neuropathy in her lower extremities, but there was no documentation of treatment for this malady in the record.[231] The ALJ acknowledged that Ms.

---

[222] AR 34-35.

[223] AR 35.

[224] *Id.*

[225] *Id.*

[226] *Id.*

[227] *Id.*

[228] AR 35-36.

[229] *Id.*

[230] AR 35.

[231] AR 36.

United States District Court
Northern District of California

1  Menefee does not live pain-free, but the ALJ's conclusion was that the evidence does not support

2  the alleged degree of limitations.[232]

3  The ALJ concluded the residual functional capacity assessment by finding that Ms. Menefee

4  was unable to perform any past relevant work.[233] The past relevant positions Ms. Menefee had

5  held are retail sales associate, accounting clerk, and user support analyst.[234] The ALJ further found

6  that a person of the same age, education, work experience, and RFC as Ms. Menefee could not

7  perform any of these positions.[235]

8  At step five, the ALJ found three jobs in the national economy that Ms. Menefee would be

9  able to perform: investigator of dealer accounts, shipping and receiving weigher, and mail clerk.[236]

10  The ALJ found that Ms. Menefee was "capable of making a successful adjustment to other work

11  that exists in significant numbers in the national economy."[237]

12  The ALJ accordingly concluded that Ms. Menefee was not disabled as of the date of the

13  decision, according to the definition of disability in 20 C.F.R. §§ 404.1520(g) & 416.920(g).[238]

14

15  **ANALYSIS**

16  Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

17  SSA commissioner if the claimant initiates the suit within 60 days of the decision. District courts

18  may set aside the commissioner's denial of benefits only if the ALJ's "findings are based on legal

19  error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g);

20  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation omitted). "Substantial

21  evidence means more than a mere scintilla but less than a preponderance; it is such relevant

22

23  _____

24  [232] *Id.*

25  [233] *Id.*

[234] *Id.*

26  [235] *Id.*

27  [236] AR 37.

[237] *Id.*

28  [238] *Id.*

evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *see also Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

### 1. Applicable Law

An SSI claimant is considered disabled if he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

#### 1.1 Five-Step Analysis to Determine Disability

There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the

1    claimant is not disabled and is not entitled to benefits. If the claimant cannot do any
2    work he or she did in the past, then the case cannot be resolved at step four, and the
     case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

3    **Step Five.** Considering the claimant's RFC, age, education, and work experience,
     is the claimant able to "make an adjustment to other work?" If not, then the
4    claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If
5    the claimant is able to do other work, the Commissioner must establish that there
     are a significant number of jobs in the national economy that the claimant can do.
6    There are two ways for the Commissioner to show other jobs in significant
     numbers in the national economy: (1) by the testimony of a vocational expert or (2)
7    by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart
     P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).
8

9    For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At

10   step five, the burden shifts to the commissioner. *Id.*

11

12   **1.2  Case Law**

13       In determining whether a claimant is disabled, the ALJ must consider each medical opinion in

14   the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v.*

15   *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the

16   Social Security Administration favors the opinion of a treating physician over non-treating

17   physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The

18   opinion of a treating physician is given deference because 'he is employed to cure and has a

19   greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the*

20   *Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226,

21   1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily

22   conclusive as to either the physical condition or the ultimate issue of disability." *Id.* (citing

23   *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759,

24   761-62 & n.7 (9th Cir. 1989)). "If a treating physician's opinion is 'well-supported by medically

25   acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

26   substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at

27   631 (quoting 20 C.F.R. § 404.1527(d)(2)).

28

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id*. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id*. (citing 20 C.F.R. § 404.1527(b)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion[,] . . . the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id*. at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." (SSR 96-02p at 4 (Cum. Ed. 1996)).

Social Security regulations distinguish three types of physicians: treating physicians; examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Hollohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The opinion of a treating physician is given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *see also Magallanes*, 881 F.2d at 751.

Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing

United States District Court
Northern District of California

reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted). Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F. 3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

An ALJ must not reject a claimant's pain testimony supported by "objective medical evidence of an underlying impairment . . . based solely on a lack of medical evidence to fully corroborate the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). An ALJ may take into account "ordinary techniques of credibility evaluation," including reputation for truthfulness and inconsistencies in testimony. *Id.* Additional factors that the ALJ may consider include: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.* (citing *Bunnell*, 947 F.2d at 346).

## 2. Application

Ms. Menefee contends that the ALJ erred by rejecting the assessments of Dr. Boccio and Dr. Zhang and by finding Ms. Menefee's testimony to be not credible.[239] The Commissioner responds

---

[239] MSJ – ECF No. 14 at 9, 11.

United States District Court
Northern District of California

that the ALJ appropriately evaluated Ms. Menefee's credibility and weighed Dr. Boccio's and Dr. Zhang's opinions.[240]

### 2.1  The ALJ Erred by Giving Little Weight to Dr. Boccio's and Dr. Zhang's Opinions

The ALJ gave little weight to the opinions of two treating physicians: Ms. Menefee's podiatrist, Dr. Boccio, and her internist, Dr. Zhang.[241] Both treated Ms. Menefee over the course of multiple years for her ailments.

For a treating physician's opinion to be given controlling weight in a disability analysis, it must be well-supported by clinical and diagnostic techniques and be consistent with other medical evidence. *See Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)). The legal standards are different when medical evidence is contradicted and when it is uncontradicted. Rejecting an uncontradicted opinion requires "clear and convincing reasons" supported by substantial evidence, while a contradicted opinion requires only "specific and legitimate reasons." *Bayliss*, 427 F.3d at 1216 (citing *Lester*, 81 F.3d at 830-31). Ms. Menefee and the Commissioner agree that the medical evidence is contradicted, and the standard thus is the "specific and legitimate reasons" standard.[242] Ms. Menefee argues that the ALJ did not identify specific contradictions in her opinion.

The ALJ gave little weight to Dr. Boccio's assessment because his opinion was "not consistent with his treatment notes" and because he "based his conclusions on an office visit conversation."[243]

First, Dr. Boccio's treatment notes are not inconsistent. Dr. Boccio's treatment notes reveal that following the two bunion surgeries he performed, Ms. Menefee healed well, showed improvements, and experienced less pain.[244] His disability analysis on March 8, 2012 states that

---

[240] Cross-MSJ – ECF No. 18 at 4, 7.

[241] AR 34.

[242] MSJ – ECF No. 14 at 9; Cross-MSJ – ECF No. 18 at 7.

[243] AR 34.

[244] AR 394, 395, 400-01, 492, 495, 580.

Ms. Menefee had significant physical limitations that would prevent her from working and providing a pain level of nine out of ten. Ms. Menefee argues that the ALJ's assertion that Dr. Boccio's opinions were inconsistent with his treatment notes is not specific or legitimate.[245] The court agrees. "Healing well and experiencing less pain" is not inconsistent with "in pain."

Second, the ALJ incorrectly concluded that Dr. Boccio based his entire disability opinion on in-office visit conversation. The record establishes that Dr. Boccio took into account a time period of almost two years when assessing Ms. Menefee for disability.[246]

The ALJ also accorded little weight to Dr. Zhang's opinions because "it appears to be based" solely on Ms. Menefee's subjective complaints rather than on the treatment records.[247] Dr. Zhang treated Ms. Menefee's diabetes, but consistently stated that it was under control with medication and not causing any complications.[248] Dr. Zhang also prescribed Vicodin to Ms. Menefee, but did not change the prescription to a more potent pain medication at any point.[249] Ms. Menefee had to change physicians in order to start a medication that treated her pain more effectively — she began seeing Dr. Edwards in 2014 because she felt that Dr. Zhang was not treating her properly.[250] Dr. Zhang referred Ms. Menefee to a number of other doctors, including cardiologists, podiatrists, dermatologists, and ophthalmologists, but did not include the related problems in his disability analysis.[251] Dr. Zhang had been treating Ms. Menefee regularly for over two years at the time of the disability questionnaire, but he put only the date of examination (February 6, 2012) in response to the question about the date he treated Ms. Menefee.[252] When asked what evidence he considered to form his opinion, Dr. Zhang wrote "interview."[253] The record reflects, however, that

---

[245] MSJ – ECF No. 14 at 10.

[246] AR 492 (stating that Dr. Boccio based his opinion on treatment notes between March 29, 2010, and March 8, 2012.)

[247] AR 35.

[248] AR 457, 613, 635, 746, 749, 808, 814, *passim*.

[249] AR 635, *passim*.

[250] AR 77.

[251] AR 504.

[252] *Id.*

[253] AR 507.

1    Dr. Zhang was Ms. Menefee's internist for over two years and treated her for many medical

2    issues. The ALJ erred by divorcing Dr. Zhang's opinion from his larger course of treatment of Ms.

3    Menefee and thus erred by according little weight to Dr. Zhang's opinion.

4        Ms. Menefee cites *Embrey v. Bowen* for the proposition that remand is appropriate when an

5    ALJ does not allege specific inconsistencies when rejecting a treating physician's opinion. *See* 849

6    F.2d 418 (9th Cir. 1988).[254] In *Embrey*, the Ninth Circuit held that the ALJ did not provide

7    specific, legitimate reasons for rejecting treating physicians' testimony when the ALJ stated that

8    "the opinions of total disability . . . are unsupported by sufficient objective findings and contrary

9    to the preponderant conclusions mandated by those objective findings." *Id.* at 421. The court noted

10   that "[t]he subjective judgments of treating physicians are important, and properly play a part in

11   their medical evaluations." *Id.* at 422. To the extent that the deficiencies that the ALJ identified are

12   contracted by the record, they are not specific or legitimate, and *Embry* thus supports remand.

13

14   **2.2   The ALJ Erred by Finding Ms. Menefee Not Credible**

15       The ALJ found that Ms. Menefee's testimony was only partially credible.[255] She based this

16   finding on Ms. Menefee's conflicting testimony regarding her diagnoses and symptoms, her

17   inability to show proof of treatment or diagnosis for neuropathy, and her disability report, which

18   showed little substantive proof of her inability to work.[256] The court remands in part because the

19   ALJ erred by discounting her credibility for these reasons.

20       An ALJ may consider many factors when determining a claimant's credibility. The two most

21   common and well-accepted factors are reputation for truthfulness and findings of inconsistency in

22   testimony. *Burch*, 400 F.3d at 680. "The ALJ must specify what testimony is not credible and

23   identify the evidence that undermines the claimant's complaints." *Burch*, 400 F.3d at 680 (citing

24   *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1988)).

25

26   _____

27   [254] MSJ – ECF No. 14 at 10.

     [255] *See* AR 35-36.

28   [256] AR 35-36.

1     An ALJ must not reject a claimant's pain testimony supported by "objective medical evidence

2 of an underlying impairment . . . based solely on a lack of medical evidence to fully corroborate

3 the alleged severity of pain." *Id.* (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). In

4 addition to truthfulness and inconsistencies, an ALJ may consider: the nature, location, onset,

5 duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors

6 (e.g., movement, activity, environmental conditions); type, dosage, effectiveness, and adverse

7 side-effects of any pain medication; treatment, other than medication, for relief of pain; functional

8 restrictions; and the claimant's daily activities. *Id.* (citing *Bunnell*, 947 F.2d at 346).

9     Although the ALJ is responsible for finding credibility, the finding will not stand when it is

10 either based on legal error or unsupported by the totality of the evidence. *Andrews*, 53 F.3d at

11 1039. The ALJ unambiguously found Ms. Menefee not to be a credible witness but erred in her

12 analysis of the cited inconsistencies.[257]

13     The ALJ discredited Ms. Menefee's testimony regarding intensity, persistence, and limiting

14 effects of her symptoms.[258] To support that finding, the ALJ noted Ms. Menefee's healing and

15 improvement following her bunionectomies, lessening pain levels, well-controlled diabetes, and

16 unsupported diagnoses of vision problems and claudication.[259] The ALJ also noted Ms. Menefee's

17 testimony regarding her alleged neuropathy, but on examination of the record found there was

18 neither official diagnosis nor treatment for this malady.[260] The ALJ also noted that she believed

19 Ms. Menefee's testimony was inconsistent regarding the reasons she stopped working, citing that

20 Ms. Menefee stated at one time that she was laid off, and at another time stated that she had a large

21 fibroid tumor.[261] The ALJ further stated that the surgery to remove the fibroid tumor was not

22 reflected in the records.[262]

23

24 _____

    [257] *See id.*

25    [258] AR 33.

26    [259] AR 33-34.

    [260] AR 36.

27    [261] AR 35.

28    [262] *Id.*

United States District Court
Northern District of California

The ALJ incorrectly analyzed the intensity, persistence, and limiting effects of Ms. Menefee's condition because she did not consider all of the available evidence. Ms. Menefee suffered from foot pain for the entire disability period, a length of almost four years. This fact speaks to the extended duration of the claimant's pain. Ms. Menefee consistently testified to having high levels of pain, and stating that she "felt okay" at doctor visits did not contradict her reporting of her pain levels. She stated that walking made her pain worse, which speaks to aggravating factors.[263] Ms. Menefee testified that she sleeps only four hours per night, that she is unable to stay at the place she lives during the day and must sit on a park bench for hours, and that she cannot walk for more than twenty minutes at a time, which speak to severe limitations to her daily activities and functional restrictions.[264] Ms. Menefee also underwent two painful and invasive surgeries for her bunions in 2010 and 2011, which speak to her willingness to undergo treatments apart from medications.[265]

The ALJ also erred in her analysis of Ms. Menefee's testimony regarding why she stopped working. Ms. Menefee's testimony on this matter answers two distinct questions: what caused Ms. Menefee's employer to lay her off and what caused her to stop working.[266] The ALJ noted that Ms. Menefee's submitted medical records did not reflect a fibroid tumor surgery or treatment, and only a post-unemployment hysterectomy was present in the record.[267] One medical record from endocrinologist Dr. Ammar Qoubaitary dated March 30, 2009, also records uterine fibroids as a past medical concern.[268]

The ALJ was incorrect in her assessment of Ms. Menefee's fibroid surgery; it was done as part of a hysterectomy in early April 2009 and is well-documented in the medical record.[269] This

---

[263] AR 84

[264] AR 79.

[265] AR 84.

[266] *See* AR 83.

[267] AR 35.

[268] AR 925.

[269] AR 1113.

inconsistency between the ALJ's finding and the medical records is the explicit source of at least some of the ALJ's credibility finding.[270] Because of these inconsistencies, the ALJ found that Ms. Menefee's testimony was unreliable.

Given the totality of the presented evidence, the ALJ's rationale for discrediting Ms. Menefee's testimony was insufficient. Although the court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation," the court finds that Ms. Menefee's credibility regarding her subjective complaints and pain must be reconsidered. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citation omitted). The court does not mean that the ALJ must take everything Ms. Menefee says at face value and instead holds only that the ALJ's articulated reasons were not a ground to discount her testimony.

## CONCLUSION

The court grants Ms. Menefee's motion for summary judgment, denies the Commissioner's cross-motion, and remands for further proceedings to reassess Ms. Menefee's disability in light of the court's conclusions about the treating physicians and Ms. Menefee's credibility.

**IT IS SO ORDERED.**

Dated: October 24, 2016

LAUREL BEELER
United States Magistrate Judge

---

[270] *See* AR 35.